UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-11661-GAO

KENNETH F. MICCICHE,
Plaintiff,

v.

N.R.I. DATA AND BUSINESS PRODUCTS, INC. d/b/a ASERDIV, DAVID CROCKER, and
PHILIP LANCTOT, JR.,
Defendants.

FINDINGS OF FACTS, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT
September 27, 2011

O'TOOLE, D.J.

The plaintiff, Kenneth Micciche, sued the defendants, N.R.I. Data and Business Products,

Inc. d/b/a Aserdiv, David Crocker, and Philip Lanctot, Jr. for violations of the Massachusetts

Wage Act, Mass. Gen. Laws ch. 149, §§ 148 and 150, and various state common law claims.

After a four-day bench trial on the matter, I make the following findings of facts and conclusions

of law, and order judgment accordingly.

## I.    Findings of Fact

Aserdiv, a Pennsylvania company with an office in Norwood, Massachusetts, sells

computer-related products and services.[1] In 2007, Micciche's cousin and president of Aserdiv,

John McGrath, introduced Micciche to the company for a possible position as a sales

representative, focusing on growing Aserdiv's business to new so-called "vertical" markets in

which Micciche was experienced, including the pharmaceutical and healthcare industries.

---

[1] Aserdiv was initially known as N.R.I. Data and Business Solutions. Aserdiv did not become an
entity until after N.R.I. Data was sold to a different company, FTC, in April 2008.

Micciche was interviewed three times for the position. The first interview took place in Norwood in the spring of 2007. In June 2007, Micciche interviewed in Norwood via videoconference with Aserdiv's Chief Executive Officer, Philip Lanctot, Jr.,[2] who was located in Pennsylvania. Micciche then had a third interview at a restaurant in Norwood with McGrath, Lanctot, and Lanctot's father, the owner of the company.

The company ultimately extended an offer to Micciche, and he began work around July 30, 2007, as an Account Executive reporting to McGrath. The terms of his employment and compensation were negotiated and memorialized in a document entitled "Compensation Plan." The Compensation Plan was based on a transitional program allowing new account executives time to build a client base. For the first nine months, his base salary, exclusive of any earned commission, was $9,000 per month. During that time, his commission was 15% of the Gross Profit sold on sales in excess of $27,000 per quarter. In the tenth month, Micciche's commission was to increase to 25%, in accordance with the typical commission rate for account executives. Likewise, his salary was to be reduced by 5% per month starting in the tenth month.

For the purpose of calculating commissions, the Gross Profit was determined using Aserdiv's cost adjusted upward by a 1.5% service charge. Gross Profit was calculated by the formula:

$$(\text{Selling Pricing} - (\text{Cost} * 1.015)) * \text{Quantity}$$

Sales representatives had access to the relevant costs when pricing a quote, and indeed, it was sensible for them to figure out costs before giving a quote.

According to Aserdiv policy, Micciche would only earn commissions for new customers he generated or for new products or new services sold to existing customers. He would not earn a

---

[2] Lanctot is a Pennsylvania resident. In his capacity as CEO, he was responsible for the company's operations and visited the Norwood office a few times a year.

commission for an existing customer's reorder of products or services previously sold to that customer. For Micciche to receive a full commission, a customer's payment had to be made in full within forty-five days of the placement of the relevant order. If a payment was not completed within forty-five days, Micciche's commission would be reduced in accordance with the following schedule: if the customer's payment was made more than 45 days after the order, he would receive 90% of the full commission; over 60 days, 75%; over 90 days, 50%; and over 120 days, no commission. Additionally, the minimum markup for a particular item was 9% of the adjusted cost, which included the cost and service charge; commissions would be reduced on items sold below the minimum markup. No commission would be paid on sales generating less than $25 Gross Profit.

In May 2008, the tenth month of his employment, Micciche's salary was scheduled to be reduced in accordance with the Compensation Plan. For some reason, however, his salary was not actually reduced. Therefore, for the rest of his employment at Aserdiv, he was paid more in salary than he was scheduled to be paid. In total, he earned approximately $14,444[3] more base salary than called for under his Compensation Plan.

A.    Micciche's Sales at Aserdiv

Micciche became involved in several accounts while a sales representative, including Fresinius, Atrium, Teradyne, and Parametric Technology Corporation ("PTC").[4]

---

[3] Scheduled deductions of 5% per month which did not happen: May: $8,550; June: $8,122.50; July: $7,716.38; August: $7,330.56; September: $6,964.03; October: $6,615.83; November: $6,285.04; December: $5,970.78. The total he would have received if the reductions had occurred over these months would have been $57,555.12. He was actually paid $72,000 over this period ($9,000 x 8 months). The difference is $14,444.88.
[4] In light of Micciche's apparent concession that he is not entitled to any commission from a sale to Milford Regional, the Court makes no particularized factual findings with respect to any sales to that company other than noting that the account belonged to a different sales representative.

### 1. Fresinius

Fresinius was a client of McGrath's, but McGrath brought in Micciche so that Micciche could help grow the account with new services not already introduced by McGrath. Thereafter, Fresinius continued to buy products and services from Aserdiv. The evidence was not clear whether any of them were new and therefore commissionable to Micciche. Consequently, I am unable to find that what Fresinius purchases entitled Micciche to any commission.

### 2. Atrius

Micciche also made sales to another Aserdiv client, Atrius Health. Atrius originally came to Aserdiv through one of McGrath's contacts, but McGrath assigned the account to Micciche to develop as a customer. Over the course of 2008, Atrius made several purchases from Aserdiv.

On March 31, 2008, Atrius submitted a purchase order for a data center assessment in the amount of $15,000. On May 8, 2008, Atrius paid $15,000 by check. However, even if this sale is credited to Micciche as claimed, it was his only sale of the quarter and did not meet the quarterly threshold amount of $27,000 for him to be entitled to a commission.

On May 2, 2008, Atrius was quoted a price of $38,640 for fulfillment services related to computer replacement. Atrius submitted a purchase order on July 11, 2008 in the same amount. However, in the absence of any convincing evidence suggesting Atrius ever paid for the fulfillment services, I am unable to find that Atrius paid for these services and, if so, when. Neither Micciche nor McGrath could remember whether Atrius made payment and copies of three Atrius checks dated 9/4/08, 08/07/08, 11/21/08 do not have memo lines describing the purpose of checks and do not add up to the order amount.. Since Atrius was an active customer of Aserdiv for various services, it cannot be assumed that the payments were for the May 2 order.

On May 6, 2008, Atrius was quoted a price of $16,800 for equipment removal services. On July 11, 2008, Atrius submitted a purchase order for the services in the same amount. Again, however, there is an absence of evidence that Atrius paid for the services. On May 9, 2008, Micciche quoted Atrius a price of $4,080 for six computer mounts. On June 10, 2008, Atrius submitted a purchase order in the same amount. On September 26, 2008, Atrius paid in full for the mounts. The payment was over ninety days late, so any commission Micciche earned on this transaction would be reduced to 50%. Furthermore, this was the only sale attributable to Micciche during the second quarter. Consequently, his total sales for the second quarter fell significantly below the required $27,000 for him to receive commission on the computer mounts.

On June 6, 2008, Micciche quoted Atrius a price of $670 for a computer cart. On June 24, 2008, Atrius submitted a purchase order in the same amount. Again, however, there is a lack of evidence as to whether the sale actually went through, and I am unable to find that it did.

On July 2, 2008, Micciche quoted Atrius a price of $6,250 for forensic services related to a breach of Atrius's website. On July 18, 2008, Atrius submitted a purchase order in the same amount. On December 11, 2008, Atrius paid for the services in full. Because payment was remitted over 120 days late, Micciche would not be entitled to any commission on the sale.

On August 25, 2008, Micciche quoted Atrius a price of $13,000 for a data center assessment. On August 27, 2008, Atrius submitted a purchase order for the same amount. A check was issued on October 3, 2008 for the service.

On October 31, 2008, Micciche quoted Atrius $1,010.14 for a flat panel computer cart. However, there is no evidence to suggest that Atrius ultimately completed the sale.

3.      *Teradyne*

Though Teradyne was one of McGrath's accounts, McGrath brought the project to Micciche and told him that it would go under Micciche's number, suggesting that any sales he made would be attributable to Micciche.

On August 15, 2008, Micciche quoted Teradyne a price of $222,767.50 for Riverbed Deployment.[5] Teradyne submitted a purchase order dated August 22, 2008, resulting in an invoice from Aserdiv dated August 31, 2008 in the amount of $260,634.77. Teradyne made payment in the same amount on December 11, 2008. Because of the late payment, under his Compensation Plan, any commission to which he was entitled was reduced 50% for the late payment. Furthermore, Micciche made an error in the quote, and Aserdiv was forced to give the company free product to compensate. The discount was sufficiently significant to negate any commission to which Micciche would be entitled.

On September 19, 2008, Micciche quoted Teradyne a price of $3,558.75 for products related to the Riverbed Deployment. Teradyne submitted a purchase order on September 25, 2008, resulting in an invoice dated October 14, 2008 for $5,230, and a final payment by Teradyne on December 19, 2008 of $3,737.75. Although it appears that Teradyne ultimately paid for part of the bill, (by a check on December 19, 2008 for $3,737.75), all the items in the purchase order are products. Because of the nature of the Riverbed relationship, the products were Riverbed's products, not Aserdiv's. Aserdiv acted as a pass-through for those products, and

---

[5] Riverbed was a company with which McGrath originally began working. The customers, such as PTC and Teradyne, were Riverbed clients, and Aserdiv facilitated the sale of Riverbed products from Riverbed to its clients. Aserdiv also provided professional installation services to Riverbed, essentially serving as a subcontractor to install products related to network speed. McGrath stayed thoroughly involved in the Riverbed relationship, but brought Micciche in to help handle the service aspect of the deal.

Aserdiv's added value was the service of installing those products. Because the sale did not include any of those services by Aserdiv, Micciche earned no commission on it.[6]

### 4. PTC

PTC was an account on which both Micciche and McGrath worked. On August 28, 2008, a quote was provided to PTC in the amount of $127,933 for goods and services related to the Riverbed Deployment. PTC submitted a purchase order for the quoted price ($106,648 for hardware and $25,285 for services) on September 9, 2008, pending a forty-five day successful evaluation. Aserdiv invoiced PTC on January 14, 2009 for $136,694.18, and PTC made payment the next day. Micciche would not have earned commission on the hardware, but he would have been in a position to earn commission on the services.[7]

### B. Vacation

Micciche's Compensation Plan guaranteed him three weeks of vacation during his first year of employment, although employees in their first year generally only accrue one vacation day for every two consecutive months of service. The plan specifies that the three weeks of vacation was for "year one." There is no provision as to what would happen the following year, but sales representatives were entitled to take vacation time, and the Employee Handbook provides that employees were allowed ten days of vacation during their second year of employment. Consequently, the most logical inference is that Micciche was entitled to ten days of vacation in 2008, his second year.

---

[6] Furthermore, the payment was over sixty days after the order, so any commission Micciche earned on this transaction would have been reduced to 75%.

[7] Though payment was made over 120 days after the original purchase order, payment appears conditioned upon the success of an evaluation. It is unclear when that evaluation started and ended, but based on the promptness with which PTC paid Aserdiv after Aserdiv issued an invoice, it is reasonable to conclude that the significant delay in the remission of payment is attributable to the evaluation, and is not something for which a commission should be docked.

When Micciche wanted to take vacation, he simply told McGrath and documented it on his personal calendar. In 2007, during his first year, Micciche took about five vacation days. He did not get paid for the remaining ten days, nor did he request compensation. In 2008, he took about five days of vacation.

C.    Micciche's Final Months at Aserdiv

During 2008, Aserdiv retained a consulting company, Trisis Technologies, to help it better track and forecast sales. David Crocker, a resident of Pennsylvania, was an employee of Trisis and was involved in the project, helping to use business management software to collect sales data in order to track and make more accurate sales forecasts. To do so, he travelled to Aserdiv's Norwood office twice, and maintained consistent telephone contact with sales employees there via telephone.

Crocker was paid by Trisis for his work.[8] He was never paid by Aserdiv, was not a director, and was not appointed by the board of directors to take on a corporate officer position. During the period of Micciche's employment, Crocker did not supervise anyone and did not have a direct role in the management of Aserdiv. More specifically, he had no role in supervising Micciche, determining his pay, deciding whether to pay commissions to him, changing his compensation plan (other than creating a spreadsheet for review), or ultimately terminating him.

By the end of 2008, Aserdiv's business had slowed considerably. Consequently, in December 2008, the salary of many employees decreased, and some employees, including Micciche, received new compensation plans with structured commissions and salary. In late December 2008, when Aserdiv was in the middle of changing payroll companies, it manually

---

[8] In April of 2009, Lanctot changed Crocker's title to "president" for public relations purposes but Crocker continued to be paid by Trisis.

issued checks to all sales representatives, including Micciche, to pay through December 31, 2008.

On December 30, 2008, a committee recommended the termination of five or six employees, including Micciche. On January 2, 2009, when managers assembled the necessary paperwork for employees Aserdiv was about to lay off, the company issued a check to Micciche for $3,946.15, representing his approximate biweekly salary net of deductions.

On January 5, 2009, Micciche's employment with Aserdiv was terminated, along with five or six other employees. On February 24, 2009, Micciche filed a Non-Payment of Wage complaint with the Massachusetts Office of the Attorney General. On February 26, 2009, the Attorney General authorized Micciche to pursue the matter through a civil lawsuit.

## II.    Conclusion of Law

### A.    Individual Defendants

As a threshold matter, the defendants argue that the Court does not have jurisdiction over the individual defendants, Lanctot and Crocker. I disagree. Among other things, Lanctot and Crocker made several trips to Massachusetts, maintained regular telephone contact with employees here, and either managed or advised about the implementation of various policies impacting Aserdiv's Massachusetts employees. The defendants' purposeful contacts here, which are related to Micciche's claims, comport with both the requirements of the Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, § 3(a), and the Due Process clause of the Fifth Amendment.

The defendants go on to argue that the common law claims, including breach of contract, promissory estoppel, and unjust enrichment, cannot lie against Lanctot and Crocker because there is no personal liability for actions of the corporation under common law. Here, Aserdiv's

corporate veil has not been pierced and Micciche has not proven, nor does he seem to argue, that Lanctot and Crocker personally contracted with him, made promises to him upon which he relied, or were unjustly enriched in their individual, non-corporate officer/consultant capacities. Consequently, neither Lanctot nor Crocker can be held responsible for the common law claims appropriately aimed at Aserdiv. See George Hyman Constr. Co. v. Gateman, 16 F. Supp. 2d 129, 148-49 (D. Mass. 1998) (citing Union Mut. Life Ins. Co. v. Chrysler Corp., 793 F.2d 1, 11 (1st Cir. 1986)).

The remaining claims against Lanctot and Crocker are violations of the Wage Act. There appears to be no dispute that the claim can be brought against Lanctot, Aserdiv's CEO during the time of Micciche's employment, but the defendants argue that Crocker cannot be held liable as an "employer" for a compensation claim under the Wage Act. The statute provides that "the president and treasurer of a corporation and any officers or agents having the management such corporation shall be deemed to be the employers of the employees of the corporation within the meaning of" section 148. Mass. Gen. Law. ch. 149, § 148. This broad definition is applicable to section 150, which establishes an employee's civil remedy for violations of section 148. Nahigian v. Leonard, 233 F. Supp. 2d 151, 160-61 (D. Mass. 2002).

During Micciche's term of employment through the date of his discharge when all compensation became due, see Mass. Gen. Laws ch. 149, § 148, Crocker was neither an officer of Aserdiv, nor an "agent[] having the management," see id. Crocker was a consultant working for a third-party company engaged to help Aserdiv track and forecast sales. He did not manage Aserdiv employees, nor did he implement any policies. He did not have any role in decisions regarding Micciche's compensation, commissions, or termination. Where Crocker did not control, direct, or participate to a substantial degree in the formulation and determination of

corporate policy, he cannot be held individually liable under the Wage Act. <u>See Wiedmann v. The Bradford Grp., Inc.</u>, 831 N.E.2d 304, 314 (Mass. 2005). It is true that he was given the title "president" for a time, but it is clear that he did not exercise the authority that a true "president" of a corporation would exercise. He was not the president in fact, and therefore is not a person within the scope of the statute.

### B.     Count I - Violation of the Massachusetts Wage Act

Employers in Massachusetts must tender wage payments to their employees in accordance with the Wage Act. Mass. Gen. Laws ch. 149, § 148. The Wage Act provides that "any employee discharged from such employment shall be paid in full on the day of his discharge." <u>Id.</u> To state a claim under the Wage Act, an employee must prove (1) he was an employee under the statute; (2) the compensation he alleges he is owed is a "wage" under the statute; and (3) the defendant did not pay him his wages in a timely manner. <u>Doucot v. IDS Scheer, Inc.</u>, 734 F. Supp. 2d 172, 192 (D. Mass. 2010) (quoting <u>Stanton v. Lighthouse Fin. Servs., Inc.</u>, 621 F. Supp. 2d 5, 10 (D. Mass. 2009)).

Micciche asserts violations based on unpaid commissions, accrued vacation days, and six days of employment.

#### *1.     Commissions*

Massachusetts General Laws chapter 149, section 148 specifically applies "to the payment of commissions[.]" However, the Act only applies to commissions that are "definitely determined" and have become "due and payable to such employee." Mass. Gen. Laws ch. 149, § 148; <u>Wiedmann,</u> 831 N.E.2d at 309. Thus, "[c]ommissions are covered by statute only if any contingencies relating to their entitlement have occurred and 'the amount due is capable of being

precisely ascertained.'" <u>Sterling Research, Inc. v. Pietrobono</u>, No. 02-40150-FDS, 2005 WL 3116758, at *11 (D. Mass. Nov. 21, 2005) (internal quotations omitted).

        a.        Had commissions become due and payable?

*Fresinius*: With respect to Fresinius sales, commissions had not become due and payable under the statute. Micciche has failed to show that the contingencies relating to entitlement had occurred, specifically that he had actually <u>earned</u> commission in accordance with Aserdiv policy. According to testimony from McGrath and Lanctot, Micciche only earned commissions for new customers that he generated or for new products or new services sold to existing customers. McGrath managed the Fresinius account and brought in Micciche to help him grow the account with new services not already introduced by McGrath. Micciche claims he made sales to Fresinius, but he has not proven that the sales were for new goods or services as required for him to earn a commission.

*Atrius*: Although Micciche claims commissions from numerous sales to Aserdiv, for all but one, he has failed to show that such commissions were due and payable to him because he had not met all of the contingencies requires for entitlement. First, Micciche was required to sell over $27,000 per quarter to be entitled to commission. His only first quarter sale was to Atrius in the amount of $15,000 and his only second quarter sale was to Atrius in the amount of $4,080. The figures fall significantly below the $27,000 required minimum necessary for Micciche to earn a commission on the sales. Additionally, while Micciche may have sold forensic services related to a breach of Atrius's website in July 2008, Atrius did not pay for the services until more than 120 days later. In accordance with his Compensation Plan, Micciche was not entitled to commission on that sale. Finally, Micciche has not proved that Atrius ever completed the sales associated with Micciche's October 31, 2008, quote for the computer cart or for purchase orders

submitted on June 24, 2008, and July 11, 2008. Of course, he is not entitled to commission on such non-sales.

The one exception is the August 2008 sale of a data assessment center in the amount of $13,000. Micciche initiated the sale through a sales quote and Atrius ultimately remitted timely payment in full. In concert with the Riverbed Deployment sale to PTC in September 2008, Micciche's sales for the third quarter totaled over $27,000. Consequently, commission is due and payable to him for the data assessment sale to Atrius.

*Teradyne*: Micciche has failed to prove that he earned commission on sales to Teradyne. Both sales involved Riverbed Deployments. As to the first, Micciche committed an error when making the quote, forcing Aserdiv to give Teradyne free products as a remedy. Thus, any money he would have earned on the sale—which would have been minor given Teradyne's late payment—was rendered meaningless by the discount. As to the second, the sale involved only Riverbed products, and Aserdiv acted only as a pass-through for those products. Because Micciche did not sell any Aserdiv services as part of the sale, he earned no commission on it.

*PTC:* Micciche has shown that the contingencies relating to the entitlement of commission were satisfied for the Riverbed Deployment PTC ordered on September 9, 2008. The sale involved Aserdiv services in the amount of $25,285 and PTC ultimately, after a successful 45 day evaluation, made full payment on the transaction. As noted, he generated over $27,000 in the third quarter. Consequently, commission is due and payable to him for the Riverbed Deployment sale to PTC.

      b.     Were the commissions definitely determined?

Because Micciche satisfied the contingencies relating to the entitlement of commission on the August 27, 2008 sale to Atrius for the data center assessment and the September 9, 2008

Riverbed Deployment sale to PTC, the question becomes whether the amounts of those commissions are "definitely determined," (i.e., capable of being precisely ascertained). On the basis of the evidence submitted at trial, they are not. Micciche's Compensation Plan specifies that he is entitled to commission on Gross Profit sold (calculated by the formula: (Selling Pricing – (Cost * 1.015)) * quantity), yet there is a lack of information in the evidence regarding the applicable costs. Micciche's central evidence with respect to costs is Plaintiff's Exhibit 19, which he concedes is beset by significant errors, including typographical mistakes, incorrect dates, seemingly incorrect prices, and mathematical errors. Furthermore, although he had access to costs when he provided quotes to clients and should have taken them into account when determining an appropriate quote, the estimated costs he proffered at trial appear be based on informal, undocumented conversations and best guesses, and do not include the 1.5 % service charge applied to Aserdiv's net cost. The evidence does not provide a way to arithmetically determine the commissions, see Wiedmann, 831 N.E.2d at 312, and in the face of such uncertainty, they are clearly not "definitely determined" under the Wage Act.

### 2. *Unused Vacation Days*

Under the Wage Act, "wages" include "any holiday or vacation payment due an employee under an oral or written agreement." Mass. Gen. Laws ch. 149, § 148. "[W]hen an employer does provide for paid vacation and an employee is entitled to paid vacation under the terms of an employment agreement, the entitlement is another form of compensation, and becomes 'due' day by day as the employee performs his or her duties," even if he is involuntarily discharged. Elec. Data Sys. Corp. v. Attorney Gen., 907 N.E.2d 635, 640, 641-42 (Mass. 2009) (deferring to Attorney General's interpretation).

When Micciche was terminated, he had accrued ten vacation days for 2008 and had taken only five. But, upon discharge, he received a paycheck for his biweekly salary, despite the fact he stopped working on January 5, only three working days into the new pay period.[9] He was therefore actually compensated for the five vacation days now in dispute.

Accordingly, Micciche has not shown that Aserdiv violated the Wage Act by failing to pay him accrued, unused vacation days.

### 3. Final Six Days of Employment

Micciche's final theory of liability under the Wage Act is based on his allegation that when he was terminated, he was owed six days of earned wages for services rendered at the time. However, Aserdiv did not owe Micciche any days of earned wages. In fact, it appears that Aserdiv overpaid Micciche in this respect because, despite the fact that his last date of employment was January 5, 2009, he was paid his biweekly salary through mid-January 2009.

### C. Count II – Breach of Contract

To prevail on his breach of contract claim, Micciche must demonstrate that there was a valid contract, that Aserdiv breached its duties under the agreement, and that the breach caused Micciche damage. See Michelson v. Digital Fin. Servs., 167 F.3d 715, 720 (1st Cir. 1999). Assuming arguendo that Micciche proved the first two elements, he has failed to show that he was damaged by any breach by Aserdiv. Under the Compensation Plan and Aserdiv policy, Micciche was entitled to commission on sales worth $38,285 and to compensation for five unused vacation days. Even using 25% as the applicable commission percentage (which should not have taken effect until Micciche's salary was reduced, which did not happen) and ignoring the requisite 1.5% service charge and all costs, Micciche would have been entitled to only

---

[9] The Court further notes that Micciche only worked "some of the time" during the last week of December, (T. 2:51), and did not work at all on January 1.

$9,571.25 in commission. However, he was overpaid over $14,000 during the term of his employment, and when he was discharged in January 2009, he was paid for two weeks when he only worked three days. It appears then that Micciche was not damaged by Aserdiv's conduct, and instead, actually benefited financially for any divergence from their agreement.

### D. Count III – Promissory Estoppel

Although claims of promissory estoppel tend to be pled as an alternative theory in the absence of an enforceable contract, and thus would not need to be addressed here, the claim fails on the merits as well. To recover on a theory of promissory estoppel, a plaintiff must demonstrate: (1) representation intended to induce a course of conduct on part of the person to whom the representation is made; (2) an act or omission because of the representation; and (3) detriment as a consequence of that act or omission. See Turnpike Motors, Inc. v. Newbury Grp., Inc., 596 N.E.2d 989, 991 (Mass. 1992). Because Micciche ultimately earned more money than he was entitled to under his Compensation Agreement, it cannot be said that he suffered a detriment.

### E. Count IV – Unjust Enrichment

Under Massachusetts law, the equitable remedy of unjust enrichment is not available to parties with an adequate remedy at law. See Infusaid Corp. v. Intermedics Infusaid, Inc., 739 F.2d 661, 668 (1st Cir. 1984); Santagate v. Tower, 833 N.E.2d 171, 176 (Mass. App. Ct. 2005). It is well-settled that "the existence of a valid express contract between the parties . . . bars the application of the equitable doctrine[]" of unjust enrichment. See Okmyansky v. Herbalife Int'l of Am., Inc., 415 F.3d 154, 162 (1st Cir. 2005). Because there is no doubt a contract existed between the plaintiff and Aserdiv and because the substance of the equitable claim is essentially

identical to his breach of contract claim (i.e., he was not paid for commissions, unused vacation days, or for his final days of employment), the defendants are entitled to judgment on Count IV.

F.      Count V – Violation of Mass. Gen. Laws ch. 149, § 148A & 150: Retaliation

To bring a claim under Massachusetts General Laws chapter 149, section 150 for violations of section 148, an aggrieved employee must first file a complaint with the Attorney General. Id. "The statute implicitly requires that the complaint adequately describe the substance of the abuse." Sterling Research, 2005 WL 3116758, at *11 (internal quotation omitted). Without such a constraint, "the purpose of the statutory requirement—to provide notice to the Attorney General that an offense had occurred and to allow him to decide whether to enforce the statute— would be undermined." Id.; see also Leonard, 233 F. Supp. 2d at 163-64 (citing Dunfey v. Primetech Prof'l Servs., Inc., No. 992306, 2002 WL 388196, at *2 (Mass. Super. Ct. Jan. 4, 2002)).

Here, Micciche argues that he was terminated in retaliation for demands he made via emails to McGrath, Lanctot, and Crocker for commissions he considered were due and owing. However, in his complaint filed with the Attorney General, he did not complete the blanks on the pre-printed form seeking information about discharge and date of discharge, and instead, cited as his reason for leaving a "[d]ramatic pay cut." (Compl. & Jury Demand Ex. 2 at 2 (dkt. no. 1-2).) He explained further that he had "never been paid any earned commissions, despite . . . repeated request for payment" and had "not been paid [his] final six days of employment and for ten accrued but unused vacation days." (Id. at 3.)

Although an employee need not specify every detail theoretically relevant, see Nahigian, 233 F. Supp. 2d at 164, a complainant must provide reasonable notice to the Attorney General about the substance of a claim. Micciche's complaint with the Attorney General focuses

exclusively on unpaid commissions and salary. It fails to even hint at the possibility he was terminated, much less terminated in retaliation for his wage demands. Having failed to provide the Attorney General with <u>any</u> information to put her on notice about a possible retaliation claim, he cannot now assert the claim against the defendants.

In any event, Micciche failed to prove as a factual matter that his discharge was in retaliation for his complaints. First, he was not specifically targeted. The evidence was clear that Aserdiv's business was experiencing difficulties, and Micciche was one of several employees who were laid off at the same time. Moreover, there was evidence of dissatisfaction on the part of his supervisors with his sales efforts. He did not apparently fulfill the purpose for which he was hired, which was to bring new customers to Aserdiv. In light of these facts, his argument that his termination was retaliatory is not convincing.

**III.** **Conclusion**

For the reasons set forth above, Micciche has not carried his burden of proof to establish any of his claims. Judgment shall enter on all counts in favor of the defendants.

It is SO ORDERED.

    /s/ George A. O'Toole, Jr.
United States District Judge